IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TIEMOKO COULIBALY, et al.

      v.                 :   Civil Action No. DKC 10-3517

J.P. MORGAN CHASE BANK,
N.A., et al.

## MEMORANDUM OPINION

In 2007, Plaintiffs Tiemoko Coulibaly and Fatou Gaye-Coulibaly bought a house. According to Plaintiffs, they and their house then became embroiled in a vast conspiracy spanning several years and implicating virtually every party involved in the purchase and financing of their home. Plaintiffs contend that Defendants' actions caused them to lose the house, burdened them with thousands of dollars in debt, spurred an audit from the Internal Revenue Service, and cost them the chance to become the President and First Lady of Côte D'Ivoire.

Now pending are several motions to dismiss filed by Defendants. (ECF Nos. 8, 12, 13, 14, 18, 20, 28). Plaintiffs have also filed a motion for sanctions against three of the defendants (ECF No. 47) and a motion that will be construed as a motion for leave to amend (ECF No. 53). The issues are fully briefed and the court now rules, no hearing being deemed necessary. *See* Local Rule 105.6. For the reasons that follow,

the motion to dismiss filed by J.P. Morgan Chase Bank, N.A. will be granted in part and denied in part. All other motions to dismiss will be granted. Plaintiffs' motion for sanctions and motion for leave to amend will both be denied.

## I. Background

### A. Factual Background

Plaintiffs allege the following facts.

### 1. The Original 2007 Loan

### a. Negotiations and Sale

On October 16, 2007, Plaintiffs signed a contract of sale with Chase Home Finance on a house at 2013 Grace Church Road, Silver Spring, Maryland. Under the original terms of the contract, Plaintiffs were to pay $444,000 for the property. Plaintiffs agreed to buy the property "as is." (ECF No. 1-8, at 11, 13, 31, 36).[1]

Things did not go as planned. "[S]oon after the contract was signed" (ECF No. 1 ¶ 25), the seller purportedly refused to ratify the agreement because Plaintiffs could not secure financing.[2] The home, which lacked flooring, was deemed

---

[1]    Relevant items in the record are cited as "ECF No. [#], at [page number]." The indicated page number is the number included in the ECF header, rather than any internal pagination found in the cited document.

[2]    The sales contract did not contain any financing contingency. (ECF No. 1-8, at 29).

uninhabitable and therefore ineligible for a mortgage. Plaintiffs insist that they never would have started negotiations on the house had they understood that it "was not eligible for any loan." (*Id.* ¶ 159).

The parties negotiated and eventually resolved the flooring issue by agreeing that Chase Home Finance would install flooring in the house. In return, they also agreed that Plaintiffs would pay $10,000 in earnest money, $9,500 of which would be transferred to Chase Home Finance and $500 of which would be credited back to Plaintiffs at closing. (ECF No. 1-8, at 4). Lastly, the seller lowered the sale price of the Grace Church Road property to $416,000. The parties formally amended the sale contract to reflect these terms on December 7, 2007.

### b. Closing and Settlement

On December 18, 2007, the parties closed on the sale. (*See* ECF No. 1-4 (HUD-1 Settlement Statement)). Defendant J.P. Morgan Chase Bank, N.A. ("Chase") loaned Plaintiffs the purchase price of $416,500. According to Plaintiffs, several problems became evident before and during closing.

First, Chase allegedly "charged additional illegal fees" because of a "discriminatory policy against minorities and

Hispanics." (ECF No. 1 ¶ 18).[3] The HUD-1 statement supposedly reflects improper fees, including a referral fee paid to Defendant Integrated Asset Services ("IAS"), a yield spread premium paid to Defendant Guardian Funding ("Guardian"), and a bonus processing free paid to Guardian.[4] Chase also allegedly misrepresented the loan's financing charge because it "was in fact based on discrimination and illegal fees to make profit and and [sic] was consequently illegal and wrong." (*Id.* ¶ 60).

Second, Plaintiffs say they were improperly forced to pay certain transfer taxes at closing despite their status as first-time homebuyers. Plaintiffs did not receive a Maryland First Time Home Buyer Tax Credit and were forced to pay certain recordation and local taxes that they say Chase was meant to pay.[5]

Third, Plaintiffs claim that they were forced to pay money to Chase for certain county property taxes that Chase had paid in advance for the period of December 18, 2007 through July 1,

---

[3] Plaintiffs say they learned of this discrimination when they received a class settlement notice relating to a case in the United States District Court for the Central District of California, *Payares v. Chase*. (ECF No. 1-2).

[4] The settlement statement reflects that these fees were paid by Chase, not Plaintiffs. (ECF No. 1-4, at 2-3).

[5] The contract of sale, however, indicates that "payment of recordation tax and local transfer tax [was to be] shared equally between the Buyer and Seller." (ECF No. 1-9, at 2).

2008.  According to Plaintiffs, Chase should have asked the county for a refund, rather than charging them.

Fourth, the settlement costs left Plaintiffs with substantial credit card debt.  A Guardian loan officer assured them that they could use credit cards to pay the costs at closing, with the understanding that they could later refinance their mortgage and obtain enough money to pay off the credit card bills.  When Plaintiffs attempted to refinance, however, they were denied; their debt was too high.  As a result, they accrued credit card debt of roughly $50,000.

Fifth, Plaintiffs believe that they were entitled to a refund of the entire $10,000 earnest money at the time of settlement.  They allege that they did not receive any such refund.  Plaintiffs characterize the earnest money as "blackmail."  (*Id.* ¶ 167).

Sixth, Plaintiffs say that they learned at closing that the property taxes were much more than they expected.  The property listing provided that property taxes for the 2006 tax year were $3,180.  (ECF No. 1-20, at 2).  But when they arrived at settlement, "they were surprised to learn on the HUD statement that the real property tax was '$5,529.65.'"  (ECF No. 1 ¶ 181).

Plaintiffs allege that Chase's misconduct at closing was aided by "several other companies listed in the HUD1 [sic] statement, all of which [sic] benefited from [the] mortgage

transaction." (*Id.* ¶ 27).  Among others, the settlement agent –
Defendant NRT Mid-Atlantic Title Services, LLC ("NRT Mid-
Atlantic") – allegedly "worked hand in hand with Chase."  (*Id.*
¶ 27).  The loan was sold to Defendant Federal National Mortgage
Association at some point ("Fannie Mae") (*see, e.g.*, ECF No.
¶ 66), who also allegedly did nothing to stop Chase's
misconduct.  Another defendant, First American Title Insurance
Company ("First American"), issued the title insurance.

### 2. Subsequent Events

Plaintiffs maintain that more problems arose after closing.

### a. Private Mortgage Insurance

In May 2008, Plaintiffs contacted Chase and requested a
cancellation of their private mortgage insurance ("PMI").
According to them, the PMI contract signed at settlement
entitled them to cancel the insurance and obtain a refund of all
PMI premium payments (a) "when equity reach [sic] 20%" or (b)
the loan-to-value ratio ("LTV")[6] on their loan fell below 80%.
(*Id.* ¶¶ 87-88).  When Chase ordered an appraisal in May, it
determined that the house was worth $532,000.  When that number
is compared with the value of the loan at the time of closing,

---

[6]     The loan-to-value ratio is a "ratio, usually expressed
as a percentage, between the amount of a mortgage loan and the
value of the property pledged as security for the mortgage."
*Black's Law Dictionary* (9th ed. 2009).

the resulting LTV would be less than 80% (*i.e.* roughly 78%). Nevertheless, Chase refused to cancel the PMI and refund all PMI payments.[7]

Plaintiffs applied for PMI cancellation again in November 2009. Rather than ordering an appraisal, Chase mistakenly ordered a broker's price opinion, which valued the home at $475,000. Although the home's value was enough to merit PMI cancellation, Chase initially refused to cancel the PMI because the broker's price opinion was used rather than a valid appraisal. In light of the mistake, Chase eventually agreed to cancel the PMI but still did not refund any premium payments.

**b. Credit Reporting**

Plaintiffs also allege that, at some unspecified time, Chase deemed Plaintiffs' loan delinquent and reported it to the credit reporting agencies, even though Plaintiffs' payments were in fact current. In a letter dated August 27, 2010, Chad King, an attorney with Defendant Simcox and Barclay, LLP ("Simcox & Barclay"), informed Plaintiffs that Chase determined the report

---

[7] Communications quoted in the complaint suggest the reasoning behind Chase's decision: PMI cancellations were generally barred within the first two years of a loan. (ECF No. 1 ¶ 97). Plaintiffs note that PMI cancellations may be permitted in the first two years of a loan where an increase in the value of the property results from improvements, but Chase did not evidently apply that discretionary exception. (*Id.*).

was an error. (ECF No. 1-19). The letter indicated that Chase would contact the credit reporting agencies to correct the mistake.

### c. Internal Revenue Service Audit

At some other unspecified time in 2008, Plaintiffs attempted to refinance with another lender. Plaintiffs received instructions from the new proposed lender on "how to do [their] tax return 2008 in order to refinance [the loan]." (ECF No. 1 ¶ 49). Despite following the lender's instructions, the lender declined to refinance the loan. The 2008 tax return, however, "raised some red flags" with the IRS, which led the Service to audit Plaintiffs' accounts. (*Id.*). Plaintiffs attribute this audit to Chase.

### d. Loan Modification

On March 16, 2009, Plaintiffs applied to Chase for a modification of their loan, apparently under the Home Affordable Modification Program ("HAMP").[8] Chase did not respond until September 15, 2009, when it denied their modification request in a one-sentence letter. When Plaintiffs contacted Chase about

---

[8] Created under authority granted in the Emergency Economic Stabilization Act, "HAMP provides financial incentives to participating mortgage servicers to modify the terms of eligible loan[s], and aims to financially assist homeowners who have defaulted on their mortgages or who are in imminent risk of default." *Zeller v. Aurora Loan Servs., LLC*, No. 3:10cv00044, 2010 WL 3219134, at *1 (W.D.Va. Aug. 10, 2010).

the denial, company representatives told them that the denial was a mistake that Chase would correct. Chase did not correct the error.

Over the next two months, Plaintiffs continued to press Chase further for explanation of their HAMP denial. Indeed, Plaintiffs reapplied for a HAMP modification twice, in December 2009 and January 2010. In two subsequent letters, dated November 5, 2009 and March 2, 2010, Chase provided two primary explanations. First, Chase indicated that Plaintiffs were ineligible because there were too many deductions on their income tax returns in prior years. Second, Chase determined that Plaintiffs had insufficient income to qualify for a modification.

On May 25, 2010, Chase approved Plaintiffs' request for a loan modification. Nevertheless, Plaintiffs insist that the modification "was approved with very bad terms" and that they were entitled to a greater reduction in payments. (*Id.* ¶ 143). Moreover, throughout the loan modification process, several Chase employees called Mr. Coulibaly "to try to deceive him with false statement [sic] on loan modification guidelines or on law." (*Id.* ¶ 44).

### e. "Conversion"

On October 25, 2010, Plaintiffs received a letter from King concerning their loan modification. The letter contained a

Maryland Land Instrument Intake Sheet ("Intake Sheet"). The letter, written on behalf of Chase "with the services of [Defendant] First American Title Company" ("First American"), purportedly informed them "of the transfer of their house to 'JP Morgan Chase.'" (*Id.* ¶ 20). This "transfer" occurred even though Plaintiffs were current on their mortgage.

King then allegedly continued to engage in several related acts of unspecified fraud "for several months through tens of email exchanges." (*Id.* ¶ 22). When Plaintiffs contacted King for an explanation, he informed Plaintiffs that the intake sheet did not in fact "convert" their property; Chase used it simply to record the May 2010 loan modification. (ECF No. 1-7, at 6, 7). Plaintiffs view this response "absurd" and insist that Chase has converted their house, which they now value at $680,000. (ECF No. 1 ¶¶ 36, 38, 82). Because of King's letter, Plaintiffs believe they have no further obligation to make mortgage payments.

**f.  Election in Côte D'Ivoire**

Tiemoko Coulibaly also maintains that, because of Chase, he could not "pursue his presidential bid for change and democracy in his country," Côte D'Ivoire. (*Id.* ¶ 196). A self-described "[h]istorian, political activist, and freedom fighter," Tiemoko "made enormous efforts towards its [sic] campaign for years." (*Id.*). He was forced to abandon these efforts, however, because

he "had to focus so much energy and time [these] last three years in the battle against Defendant[s]." (*Id.*).

**B.  Procedural Background**

On December 16, 2010, Plaintiffs filed a 63-page, fifteen-count pro se complaint against nine named defendants and unspecified "John and Jane Doe Defendants."  The complaint asserts claims of: (1) civil conspiracy; (2) intentional infliction of emotional distress; (3) violations of the Fair Housing Act ("FHA"); (4) additional violations of the FHA and related violations of the Truth in Lending Act ("TILA"), Real Estate Settlement Procedures Act ("RESPA"), and the Equal Credit Opportunity Act ("ECOA"); (5) breach of contract and "violation of [the] Maryland First-Time Home Buyer Closing Cost Reduction Act"; (6) breach of contract and conversion "of [the] house's ownership"; (7) negligence and gross negligence; (8) "malicious violation" of the PMI contract; (9) "malicious violation" of "HAMP Guidelines;" (10) unjust enrichment resulting from "the bad terms of HAMP modification"; (11) "malicious breach of contract and conversion of Plaintives's [sic] money at the settlement"; (12) fraud, breach of contract, blackmail, and conversion relating to the earnest money; (13) misrepresentations in the property listing in violation of the Lanham Act and RESPA; (14) "misrepresentation and fraud" resulting in "increased credit card debt"; and (15) fraud

resulting "in the cancellation of Plaintiff's presidential campaign." The complaint requests substantial monetary damages, rescission of Plaintiffs' mortgage, punitive damages equal to 2%-5% of Chase's profits for the last three years, and sanctions against two Maryland lawyers. Although they are proceeding pro se, they also request attorneys fees to compensate them for their "thousands of hours of legal research and work." (ECF No. 1, at 63).

Plaintiffs successfully served eight of the nine named defendants. Throughout February and March of 2011, each of those defendants then filed motions to dismiss. (ECF Nos. 8, 12, 13, 14, 18, 20, 28). Plaintiffs opposed all of the motions to dismiss.[9] (ECF Nos. 39, 46). Several defendants filed replies. Plaintiffs also filed a surreply to the replies filed

---

[9] Plaintiffs raise additional claims in their submissions on Defendants' motions to dismiss. They claim, for example, that Chase and Fannie Mae failed to comply with certain "notice of transfer" requirements. (ECF No. 46, at 12-13). Plaintiffs also crafted a new theory that they never agreed to most of the fees at settlement, but signed all the relevant documents because they were told they could seek a refund later. (ECF No. 46, at 32-34). They further allege that certain defendants did not follow "closing instructions" at settlement. (ECF No. 39, at 9). Such allegations are not in the complaint. The court will not consider these contentions or any other new claim that falls outside the complaint.

by First American Title Insurance Company, FAACS,[10] and NRT Mid-Atlantic. (ECF No. 49). They did not seek of leave of court to do so.[11]

Plaintiffs never served Guardian, the ninth defendant. Thus, the court issued a show cause order on May 2, 2011. (ECF No. 48). Plaintiffs responded to that order on May 13, 2011. (ECF No. 50).

In addition, on March 16, 2011, Plaintiffs filed a motion for leave to file a memorandum in support of a motion for Rule 11 sanctions exceeding the fifty-page limit set by Local Rule 105.3. (ECF No. 32). The court denied that motion. (ECF No. 36). In the same order, the court cautioned Plaintiffs that motions for sanctions should not be filed "as a matter of course" and that they could face sanctions themselves for submitting an "unjustified" sanctions motion. (*Id.* at 3 n.1). The court reiterated that warning on April 12, 2011 in another order. (ECF No. 43). Nevertheless, on April 28, Plaintiffs filed a fifty-page motion for sanctions, with an additional

---

[10]   Plaintiffs separately sued FAACS, an entity related to First American. For the sake of expediency, this opinion refers to FAACS and First American as "First American."

[11]   Because they did not seek leave of court to file a surreply, the court will not consider it. *See* Local Rule 105.2(a).

twenty-five page supplemental memorandum and thirty-two supporting exhibits. (ECF No. 47).

Most recently, on May 18, 2011, Plaintiffs filed a motion for leave to add two additional defendants: Jobin Realty, their real estate agent when they purchased the house on Grace Church Road, and Continental Home Loans, a New York based-lender who denied their application for a loan refinancing. (ECF No. 53).

## II. Motions to Dismiss

### A. Standard of Review

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). Accordingly, the court must consider all well-pleaded allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The court need not take everything as true, however. For instance, the court need not accept unsupported legal allegations. *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Nor must it agree with legal conclusions couched as factual allegations, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v.*

14

*Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).  And if the properly considered facts show nothing more than the "mere possibility of misconduct," the complaint should not survive a Rule 12(b)(6) motion.  *Iqbal*, 129 S.Ct. at 1950 (quotation marks omitted).

Plaintiffs' complaint must be construed liberally because they are proceeding pro se.  *Hughes v. Rowe*, 449 U.S. 5, 9 (1980).  Liberal construction means the court will read the pleadings to state a valid claim to the extent it is possible to do so from the facts available; it does not mean that the court should rewrite the complaint to include claims never presented. *Barnett v. Hargett*, 174 F.3d 1128, 1132 (10th Cir. 1999).  In other words, even when pro se litigants are involved, the court cannot ignore a clear failure to allege facts that support a viable claim.  *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

At this stage, the court focuses on the facts in the complaint and the documents attached to the complaint.  *Abadian v. Lee*, 117 F.Supp.2d 481, 485 (D.Md. 2000).  In addition, the court may consider documents referred to and relied upon in the complaint – "even if the documents are not attached as exhibits." *Fare Deals Ltd. v. World Choice Travel.com, Inc.*, 180 F.Supp.2d 678, 683 (D.Md. 2001); *accord New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1164 (4th Cir. 1994).  The court is also free to take judicial

notice of – and consequently consider – matters of public record. *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). If the "bare allegations of the complaint" conflict with exhibits or other properly considered documents, then "the exhibits or documents prevail." *Fare Deals*, 180 F.Supp.2d at 683; *accord RaceRedi Motorsports, LLC v. Dart Mach., Ltd.*, 640 F.Supp.2d 660, 664 (D.Md. 2009).

### B. Analysis

Plaintiffs' complaint is a somewhat disjointed account of various events; it is difficult to divide these facts into individual claims. Although Plaintiffs have asserted fifteen individual "counts," the allegations contained within those counts largely refer to Chase. Many of them overlap and some contain little explanation. Consequently, rather than focusing on Plaintiffs' "counts," each defendant's motion to dismiss (a) identified any facts relevant to that defendant in the complaint; and (b) explained why none of Plaintiffs' claims could succeed based on those relevant facts. This opinion will proceed in the same fashion.

### 1. Chase

### a. Alleged Conversion

Throughout the complaint, including counts one, four, and six, Plaintiffs contend that Chase "converted" Plaintiffs' Silver Spring home via the Intake Sheet. Plaintiffs believe

16

that the Intake Sheet, which was created during the 2010 loan modification, "transferred the ownership of the Property from Plaintiffs to Chase and Plaintiffs don't have anymore any mortgage with Defendant Chase, the 'new owner' of the property." (ECF No. 46, at 25-26). They say the Intake Sheet "speaks by itself." (ECF No. 46, at 30). Plaintiffs are mistaken.

There was no conversion here because Chase never asserted any dominion or control over Plaintiffs' home. Conversion is "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Lasater v. Guttmann*, 194 Md.App. 431, 446 (2010). Here, Plaintiffs assert the act of conversion was a transfer of legal ownership.

But there was no such transfer. "In transactions involving the transfer of title to real property, the most important legal act is recordation of the deed in the land records of the county where the property is situat[ed]." *Attorney Grievance Comm'n of Maryland v. Sweitzer*, 395 Md. 586, 595 (2006). Legal title to land may not transfer until a valid deed is properly recorded. *Childs v. Ragonese*, 296 Md. 130, 139 n.8 (1983); *accord Washington Mut. Bank v. Homan*, 186 Md.App. 372, 388 (2009); *see also* Md. Code Ann., Real Prop. § 3-101(a). A land intake sheet is not such a deed. For one, Maryland law provides that the intake sheet is "not part of the instrument" conveying an

interest in property and does not even constitute constructive notice of the contents of the instrument. Md. Code Ann., Real Prop. § 3-104(g)(9)(ii). For another, a valid did must be executed and acknowledged. Md. Code Ann., Real Prop. § 4-101(a)(1). The Intake Sheet, which is not a deed, was not acknowledged.

Perhaps more importantly, Montgomery County land records indicate that there was no transfer in ownership – there was simply a loan modification.[12] *See* Home Affordable Modification Agreement Between Tiemoko Coulibaly, Fatou G. Coulibaly, and JPMorgan Chase Bank, N.A., 3 November 2010 (filed 28 March 2011), Montgomery County, Maryland, Book 41367, at 68-77. These public records, which the court may consider on a motion to dismiss, indicate that Plaintiffs continue to own the house on Grace Church Road, subject to Chase's security interest.

Plaintiffs resist, emphasizing that the Intake Sheet lists them as "grantors" and Chase as "grantee." That does *not* mean that Chase foreclosed on Plaintiffs and took their home away from them. Rather, those labels merely reflect that Plaintiffs granted Chase a security interest in their home in exchange for

---

[12] Plaintiffs admit as much when they plead that they "reside in a home *which they own* in Silver Spring, Maryland." (ECF No. 1 ¶ 6 (emphasis added)).

the loan.  *See Fagnani v. Fisher*, 418 Md. 371, 382-83 (2011)
(describing the nature and function of a deed of trust).
Because the 2010 loan modification modified that "grant," the
loan modification's cover sheet lists them as grantors.  There
was no conversion.

   **b.  Closing Fees**

   Plaintiffs make several claims relevant to certain fees
paid out at settlement, including referral fees and yield spread
premiums.  In particular, they contend that these fees were
discriminatory and violated several federal consumer protection
statutes.  There is no merit to these contentions.

   In count three, Plaintiffs argue that Chase "discriminated"
against them by imposing the fees.  The legal basis for the
"discrimination" claim is unclear.  The complaint seems to rely
upon only the FHA, a federal statute that prohibits
discrimination "against any person in the terms, conditions, or
privileges of sale or rental of a dwelling . . . because of
their race."  42 U.S.C. § 3604(b).  Chase, however, construes
this as a race-based discrimination claim under 42 U.S.C.
§ 1981, another federal statute that protects the rights of all
citizens to "make and enforce" contracts.  42 U.S.C. § 1981(a).

   Regardless of how the claim is construed, it fails.  Any
claim under the FHA is now time-barred.  Plaintiffs insist that
their claim falls within the three-year statute of limitations

for fraud in Maryland. The FHA, however, contains its own two-year statute of limitations. *See* 42 U.S.C. § 3613(a)(1)(A); *see also Kuchmas v. Townson Univ.*, 553 F.Supp.2d 556, 561-62 (D.Md. 2008). The allegedly excessive fees were charged at closing in December 2007, but Plaintiffs did not file suit until December 2010.

Plaintiffs seek to avoid the FHA's statute of limitations by invoking two doctrines: a continuing violation theory and the discovery rule. They point to Chase's entire course of conduct as one continuous fraudulent scheme. And they argue that they were not aware of any discrimination until they received notice relating to a class action settlement concerning Chase, *Payares v. Chase Bank USA, N.A.*, Case No. CV 07-05540 AG (ANx) (C.D.Cal. filed Aug. 23, 2007).[13] Neither argument succeeds.

First, the continuing violation does not apply here. "Under the continuing violation doctrine of limitations, the limitations period does not begin to run until the happening of the 'last asserted occurrence' of discrimination." *Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*, 40 F.Supp.2d 700,

---

[13] Plaintiffs do not indicate that they opted out of the *Payares* settlement. Therefore, any claims falling within the scope of that settlement might very well be barred.

710 (D.Md. 1999). Certainly, if Plaintiffs were to plead facts establishing a continuing violation extending past December 2008, such facts might render their claim timely. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 (1982) (applying continuing violation theory in FHA context). But there are no such facts here. Their problems with excessive fees began and ended at settlement in December 2007, when those fees were charged and paid. Even if Plaintiffs continue to suffer financial consequences from those fees, that would not evidence a continuing violation. "A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991).

Second, the discovery rule does not apply here, either. The discovery rule allows a claim to accrue "when the litigant first knows *or with due diligence should know* facts that will form the basis for an action." *Merck & Co., Inc. v. Reynolds*, 130 S.Ct. 1784, 1794 (2010) (emphasis in original); *accord Tidewater Fin. Co. v. Williams*, 498 F.3d 249, 260 n.11 (4th Cir. 2007).

The unambiguous language of the FHA's statute of limitations provision provides that the "occurrence or the termination" of the discriminatory practice triggers the limitations period. 42 U.S.C. § 3613(a)(1)(A). Given that

language, which is triggered by an *occurrence*, courts have been unwilling to apply the discovery rule in the FHA context. *See, e.g.*, *Moeske v. Miller and Smith, Inc.*, 202 F.Supp.2d 492, 509 (E.D.Va. 2002); *see also Garcia v. Brockway*, 526 F.3d 456, 465 (9th Cir. 2008); *but see Miller v. Countrywide Bank, N.A.*, 571 F.Supp.2d 251, 264 (D.Mass. 2008) (noting disagreement amongst courts).

Even if the discovery rule did apply, arguing for its application in this case would be a decidedly uphill battle for Plaintiffs. "[T]he term 'discovery' in respect to statutes of limitations for fraud has long been understood to include discoveries a reasonably diligent plaintiff would make." *Merck*, 130 S.Ct. at 1795. Here, Plaintiffs became aware of the fees of which they now complain at closing; nevertheless, they took no further action until they received a letter indicating they might possess a cause of action. Such circumstances suggest far less than reasonable diligence.

Plaintiffs' discrimination claim would also fail if it were read as a claim pursuant to 42 U.S.C. § 1981. To prevail in a Section 1981 action, a plaintiff must establish that: "(1) he or she is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities protected by the statute." *Buchanan v. Consol. Stores Corp.*, 217 F.R.D. 178, 190

(D.Md. 2003). This prima facie case aside, the core of any Section 1981 case is the showing of *intentional* discrimination. *Id.*

The complaint lacks factual allegations concerning the critical element of intentional discrimination. Instead, it merely cites language from a class action settlement notice that Plaintiffs insist amounts to an admission of discrimination. The papers from *Payares* are not admissions of discrimination; indeed, the final judgment and order of dismissal in the case states that "Chase denies any wrongdoing, fault, violation of law, or liability for damages of any sort." (ECF No. 1-3, at 2).

Moreover, as a general matter, the mere existence of a settlement does not establish liability or wrongdoing. Indeed, this general policy against using settlement agreements to establish liability is embodied in a Federal Rule of Evidence, Rule 408, which renders such agreements inadmissible. Plaintiffs are adamant that a sophisticated party like Chase would not "pay millions of dollars" unless there was some wrongdoing. (ECF No. 46, at 46). Such an argument ignores the realities of modern litigation, where parties settle for a myriad of reasons too numerous to describe in detail here. *See, e.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007) ("[T]he threat of discovery expense will push cost-conscious

defendants to settle even anemic cases."). As one court recognized more than one hundred years ago, "[i]t costs time, trouble and money to defend even an unfounded claim. Parties have a right to purchase their peace." *Georgia Ry. & Elec. Co. v. Wallace & Co.*, 50 S.E. 478, 480 (Ga. 1905). It follows then that a complaint is insufficient when it merely invokes the fact of a prior settlement without presenting factual allegations relevant to the case at hand.

Because there are no facts in Plaintiffs' complaint rendering it plausible that Chase intentionally discriminated on the basis of race by imposing excessive fees, this claim must be dismissed.

In count four, Plaintiffs recharacterize their fee-centered discrimination claim as a separate claim under four statutes: TILA, which requires certain fee and cost disclosures; RESPA, which prohibits kickbacks between lenders and certain third parties; ECOA, which bars discrimination in the credit application process; and (again) the FHA. Construed liberally, this claim seeks rescission. RESPA and ECOA do not actually provide for rescission. *See, e.g.*, *Barret v. Am. Partners Bank*, No. AW-08-0319, 2009 WL 2366282, at *6 (D.Md. July 28, 2009) (no right to rescission under RESPA); *Riggs Nat'l Bank of Washington, D.C. v. Linch*, 829 F.Supp. 163, 169 (E.D.Va. 1993) (same under ECOA). The same would seem to be true for the FHA.

*See* 42 U.S.C. § 3613 (listing relief available to private parties but not including rescission). Even if one overlooks those problems, however, none of the statutes affords Plaintiffs relief.

Each of Plaintiffs' claims under these federal statutes is time-barred. The court has already explained that any claim for relief under the FHA is untimely. The same is true for claims under RESPA, ECOA, and TILA. RESPA contains a one-year statute of limitations for most civil actions, excepting certain claims not relevant here. *See* 12 U.S.C. § 2614. Similarly, ECOA provides that any actions must be brought no "later than two years from the date of the occurrence of the violation." 15 U.S.C. 1691e(f). Under TILA, any claim for damages must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e).

TILA permits borrowers to seek rescission up to three years after "consummation of the transaction" where (a) the lender does not provide notice of the right to rescission to the borrower or (b) the lender has initiated foreclosure (and certain other conditions are met) and the borrower raises rescission as an affirmative defense. *See* 15 U.S.C. § 1635(a),(f),(i). Plaintiffs do not plausibly allege that either of those two circumstances exists here. Accordingly, their

right to rescission ended three days after they closed on the loan. *See* 15 U.S.C. § 1635(a). This action is untimely.

The TILA claim would fail even if it were timely. Plaintiffs' theory seems to rely on the yield spread premium, "a payment from the lender to the broker, the amount of which reflects the loan's interest rate and consequently the lender's profits." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 739 (5th Cir. 2003). Plaintiffs reason that the payment is evidence that they were charged an interest rate higher than the minimum rate for which they were eligible. TILA does not prevent a lender from charging a higher rate of interest; it simply requires lenders to disclose accurately the actual rate of interest charged. There is no allegation in the complaint that Chase (or any other defendant) inaccurately disclosed the interest rate. *See, e.g.*, *In re Mayer*, 379 B.R. 529, 544 (Bankr.E.D.Pa. 2007) (finding non-disclosed yield spread premium did not violate TILA where interest rate was accurately disclosed). And because Chase paid the yield spread premium, there is also no conceivable way the yield spread premium could have affected the finance charge. Thus, there is no TILA violation evident in the complaint.

### c. Taxes

Plaintiffs next complain that they were forced to pay certain taxes, which they say amounted to a "malicious breach of

contract." They maintain that, as first-time homebuyers, they should not have been forced to pay any recordation or local transfer taxes. They also argue that they should not have been required to reimburse Chase for taxes that were paid on the home for the period of December 18, 2007 through July 1, 2008.

Plaintiffs have not plausibly alleged any claim based on Chase's failure to pay all of the recordation and local transfer taxes. Under Maryland law, to establish breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant materially breached that obligation. *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658 (2010). Chase had no obligation – contractual or otherwise – to pay all these taxes.

Ordinarily, sellers pay the recordation and local transfer tax on a property when a first-time Maryland homebuyer buys the property as his principal residence. Md. Code Ann., Real Prop. § 14-104(c)(1). But that general rule does not apply when there is an "express agreement" between buyer and seller that the seller will not bear all those costs. *Id.* The sales contract here contained just such an agreement, explaining:

> If the Buyer is a first-time Maryland homebuyer, Buyer and Seller expressly agree, in accordance with Section 14-104(c) of the Real Property Article, Annotated Code of Maryland, that payment of recordation tax and local transfer tax shall be shared equally between the Buyer and Seller unless

27

> a "First-Time Maryland Homebuyer Transfer
> and Recordation Tax Addendum" is attached,
> which contains a different express
> agreement.

(ECF No. 1-9, at 2 (emphasis in original)). The complaint does not allege that Plaintiffs completed a "First-Time Maryland Homebuyer Transfer and Recordation Tax Addendum." The HUD-1 settlement statement indicates that the taxes were split in accordance with this agreement. (ECF No. 1-4, at 2). Plaintiffs received the benefit they bargained for.

Plaintiffs' claim that they were inappropriately forced to reimburse Chase for certain "prepaid" property taxes, but this claim fails as well. Plaintiffs bring this as a RESPA claim, which would be time-barred (as explained above). In any event, it is hard to see any basis for a valid claim based on these charges. Chase was simply seeking reimbursement for a tax bill that Plaintiffs themselves would have otherwise had to pay Montgomery County. That reimbursement was fully disclosed at closing and Plaintiffs agreed to pay it in the express terms of the sales contract. (*See* ECF No. 1-8, at 19).

One other tax-related issue merits discussion: Plaintiffs' argument that the real-estate listing understated the property taxes on the home. According to Plaintiffs, the property listing explained that property taxes for the 2006 tax year were $3,180, while the actual taxes exceeded $5,500. They allege

that the listing constituted false advertising under the Lanham Act.[14]

Chase responds by supplying the actual tax bill for the tax year 2006, which are public records in Montgomery County. (ECF No. 12-8). It argues that the tax bill, once relevant credits are considered, was $3,213.01. It suggests a "reasonable explanation" therefore exists for the property taxes listed in the real estate listing and observes that the tax information on the home was publicly available.

To establish a false advertising claim under the Lanham Act, a plaintiff must show that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff

---

[14] The heading to this count of the complaint also references RESPA and the "Unfair and Deceptive Practice Act." Again, any RESPA claim would be time-barred. There is also no basis for any claim under either the Federal Trade Commission Act or the Maryland Consumer Protection Act. As noted below, Plaintiffs have no standing to pursue a claim under the federal statute. And the state statute cannot be applied to professional acts by "real estate salespersons," which at bottom is what Plaintiffs seek to do here. *See* Md. Code Ann., Com. Law § 13-104(1).

> has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310-11 (1st Cir. 2002)). Chase's argument would seem to go to the second element, materiality. If the tax described in the listing was "off" by only a slight amount, and if the information was in any event publicly available, then there would not seem to be any real likelihood that the listing's alleged misstatement would "influence the purchasing decision." *See, e.g.*, *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010) ("Even if an advertisement is literally false, the plaintiff must still establish materiality."). Plaintiffs also were not buying a product off the shelf, but instead were making a substantial investment in a long-lasting "product" after weeks of negotiation. In such circumstances, buyers are likely to place less emphasis on the initial real estate listing and more emphasis on other factors. *Cf. Allen Organ Co. v. Galanti Organ Builders, Inc.*, 798 F.Supp. 1162, 1169 (E.D.Pa. 1992) (finding advertisement was less material where advertised product was not an impulse consumer purchase and constituted a long-term, large financial investment).

The lack of materiality is enough to justify dismissal. And "courts increasingly use materiality as a means of eliminating cases before trial, even where the court has held that the defendant's factual representation is literally false." 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:35 (4th ed. 2011 supp.). On the other hand, the Fourth Circuit has cautioned – albeit in other contexts – that the "materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss." *Dunn v. Borta*, 369 F.3d 421, 427 (4th Cir. 2004); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) ("[B]ecause the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss."). In this instance, however, the lack of materiality justifies dismissal.

Furthermore, a more fundamental problem dooms the Plaintiffs' claim:  Plaintiffs lack statutory standing to bring a Lanham Act claim at all.[15]  Plaintiffs have not alleged any

_____

[15]  If a plaintiff lacks either Article III or statutory standing, the court lacks subject matter jurisdiction over the case. *Wilmington Shipping Co. v. New England Life. Ins. Co.*, 496 F.3d 326, 334 (4th Cir. 2007).  Subject matter jurisdiction may be raised by the court or any party at any time before final judgment. *In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010).

relationship with Chase other than a seller-consumer relationship. A consumer does not have standing under the Lanham Act to sue for false advertising. *Made in the USA Found. v. Phillips Foods, Inc.*, 365 F.3d 278, 281 (4th Cir. 2004). In fact, "no court has held that a consumer has standing." *Foster v. Wintergreen Real Estate Co.*, 363 F.App'x 269, 275 (4th Cir. 2010). Only a commercial plaintiff who alleges that its commercial interests have been harmed may bring a Lanham Act claim. Plaintiffs' Lanham Act claims must be dismissed for lack of standing.

Accordingly, all tax-related claims must be dismissed.

### d. Earnest Money

Plaintiffs next assert that Chase wrongfully took $10,000 in earnest money at settlement. They allege this amounted to a breach of contract, conversion, and violated federal law. For several reasons, any claims related to the earnest money must fail.

Among other things, Plaintiffs' claims concerning the earnest money rely upon the "Federal law Unfair and Deception Practice Act." Liberally construed, this allegation would seem to be a reference to Section 5 of the Federal Trade Commission Act ("FTC Act"), which prohibits engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C.

§ 45(a)(1). Plaintiffs have no standing to bring an action under Section 5 because "under the [FTC Act] no private party – consumer or competitor – has standing to sue." *Penn-Plax, Inc. v. L. Schultz, Inc.*, 988 F.Supp. 906, 911 n.1 (D.Md. 1997); *see also A&E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 675 (4th Cir. 1986).

Exercising an *extraordinarily* liberal reading of the complaint,[16] one might read this claim as an attempt to allege violations of the Maryland Consumer Protection Act, which also protects against unfair and deceptive trade practices. *See* Md. Code Ann., Com. Law § 13-301 to -319. Yet even then, the exhibits attached to the complaint establish that Plaintiffs' claim must be dismissed. In an addendum to the sales contract, the parties agreed that Plaintiffs would pay a total of $10,000 in earnest money. (ECF No. 1-8, at 4). Most of that money, $9,500, was to be "released to the seller." (*Id.*). In other words, that money was to go to Chase. The remaining sum of $500 was to be transferred back to Plaintiffs at closing. (*Id.*). The settlement statement indicates that is exactly what happened: the $500 was credited to Plaintiffs' side of the

---

[16] There is nothing in the complaint indicating that Plaintiffs intended to assert a state law claim, but Plaintiffs' opposition seems to assume that state law was the intended basis for their "unfair and deceptive practices" claims.

ledger at closing. (ECF No. 1-4, at 1). The very exhibits upon which Plaintiffs rely flatly refute their view that they should have received a check for $10,000 at the time of closing.[17] Because all matters concerning the earnest money were disclosed and agreed to by Plaintiffs, there were no actionable unfair practices here.

For similar reasons, there was no breach of contract and no conversion. Lacking a contractual obligation, there can be no breach. *See RRC Northeast*, 413 Md. at 658. And because Plaintiffs had no entitlement to the $9,500 they did not receive, there was no conversion.[18] These claims must be dismissed.

### e. Private Mortgage Insurance

In paragraphs 87 through 107 of the complaint, Plaintiffs describe Chase's treatment of their private mortgage insurance as "another exemple [sic] of an intentional violation of written contract." (ECF No. 1, at 28). They say Chase refused to

----

[17] Oddly, Plaintiffs' opposition suggests they were entitled to a check for $28,000 at the time of closing. (ECF No. 46, at 34). This inexplicable argument apparently comes from Chase's observation that Plaintiffs received a $27,500 price reduction when the contract was amended. (ECF No. 12-1, at 16).

[18] Moreover, "[t]he general rule is that monies are intangible and, therefore, not subject to a claim for conversion." *Lasater*, 194 Md.App. at 447.

cancel their PMI even though their contract entitled them to cancellation.   Plaintiffs are incorrect.

Once more Plaintiffs' claims fail because they have failed to establish that Chase breached a *contractual* obligation. Chase attached the PMI notice to its motion to dismiss and Plaintiffs did not challenge its authenticity.   The court may therefore consider it.   *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009).   Although both parties seem to refer to the notice as a contract, it is better described as a notice of certain statutory rights under the Homeowners Protection Act ("HPA").   *See* 12 U.S.C. § 4903 (explaining required disclosures).   Thus, this alleged "contract" could really only be breached if Chase ran afoul of the HPA rights described in the notice.   It did not.

Congress enacted the HPA in 1998 to "establish Federal guidelines for disclosure and termination of private mortgage insurance."   H.R.Rep. No. 105-55, at 4 (1997).   As one court explained:

> Under the HPA, PMI must be terminated by the servicer on the date when the principal balance of the loan is first scheduled to reach 78 percent of the "original value" of the property securing the loan (the "termination date") provided that the mortgagor is current on the payments required under the mortgage.   The HPA also provides that a mortgagor may request cancellation of PMI on, or at any time after, the date when the principal balance

on the mortgage declines to 80 percent of
the original value of the property (the
"cancellation date"). . . . After
termination or cancellation of PMI, no
payments of premiums may be required from
the mortgagor and any unearned premiums paid
by the mortgagor must be returned.

*See Fellows v. CitiMortgage, Inc.*, 710 F.Supp.2d 385, 396
(S.D.N.Y. 2010) (citations and footnotes omitted). Of
particular relevance here, the HPA defines "original value" as
"the lesser of the sales price of the property securing the
mortgage, as reflected in the contract, or the appraised value
at the time at which the subject residential mortgage was
consummated." 12 U.S.C. § 4901(12).

The notice applies the above requirements to Plaintiffs'
mortgage. Plaintiffs' PMI would automatically terminate on
January 1, 2021, when "the principal balance of the mortgage,
based solely on the initial amortization schedule . . . is first
scheduled to reach 78%." (ECF No. 12-6, at 3). That trigger
has not yet occurred. Alternatively, the contract provided that
Plaintiffs could cancel their PMI in two circumstances. First,
Plaintiffs could cancel on March 1, 2020, when the principal
balance of loan, based solely on the initial amortization
schedule, would reach 80% of the original value. That condition
has obviously not been met. Second, Plaintiffs could cancel
when "the principal balance of the mortgage loan reaches 80% of
the original value of property securing the loan based on

[Plaintiffs'] actual payments." (ECF No. 12-6, at 3). The "original value" was the lesser of the sales price and the appraised value at closing: $416,500. (ECF No. 1 ¶ 89 (sales price); ¶ 105 (appraised value at closing)). Thus, to be entitled to cancel their PMI, Plaintiffs would need to reduce the principal balance of their loan, *based on actual payments*, to $333,200 (or 80% of the original value).

Plaintiffs do not allege that they paid down the principal balance of their loan to the level required for cancellation. Indeed, their complaint suggests that the principal balance at the time of their first PMI application was $408,363, or 98.05% of the original value. They instead argue that the appraised value of their home increased, resulting a loan-to-value ratio of less than 80%. Yet neither the notice nor the HPA refer to loan-to-value ratios; rather, they both focus on the loan balance as affected by actual payments. Thus, the mere fact that Plaintiffs' home allegedly increased in value did not entitle them to cancellation under the terms of the notice or the HPA.

Both Chase and Plaintiffs talk at length about certain "guidelines" concerning PMI cancellation. Presumably, the parties are referring to the Fannie Mae Servicing Guide, which provides for additional conditions under which PMI *may* be cancelled. Both parties recognize that this Servicing Guide is

37

not part of any contract between the parties. Lacking any allegation that the Servicing Guide imposed contractual duties between Chase and Plaintiffs, this "guidelines" discussion is superfluous. Nor could Plaintiffs proceed under a third-party beneficiary theory, as "[o]ther federal courts that have addressed this issue have uniformly rejected the notion that borrowers are third-party beneficiaries of servicing guides." *Fellows*, 710 F.Supp.2d at 406 (quotation marks omitted). But Plaintiffs' argument concerning these "guidelines" is triply deficient, as the guidelines seem to provide circumstances when a lender/servicer *may* exercise its discretion – not when they *must*. In other words:

> The 'right' to cancel private mortgage insurance . . . does not arise from a contractual or other legal duty. [Fannie Mae] made a business decision to give borrowers the option to cancel private mortgage insurance early, despite the fact that the mortgage contract did not provide for early cancellation.

*Hinton v. Fed. Nat'l Morg. Ass'n*, 945 F.Supp. 1052, 1057 (S.D.Tex. 1996).

Plaintiffs' claims concerning PMI must be dismissed.

### f. Loan Modification

Plaintiffs bring several claims related to their attempts to obtain a HAMP loan modification. They again invoke ECOA. They assert violations of the HAMP guidelines. And they

38

maintain that Chase was unjustly enriched because it was "permitted to retain each month the sums obtained as a result of [its] malicious violations of the HAMP waterfall calculation guidelines."[19]  (ECF No. 1 ¶ 151).  While the complaint fails to state a claim as to the latter two bases, the ECOA claim can proceed (in part).

First, Plaintiffs may not establish liability by relying on Chase's alleged violations of certain servicing guidelines promulgated by the U.S. Department of the Treasury in connection with HAMP.  "[I]t is well established that there is no private cause of action under HAMP."  *See Melton v. Suntrust Bank*, ---- F.Supp.2d ----, No. 2:11cv204, 2011 WL 1630273, at *1 (E.D.Va. Apr. 21, 2011); *see also In re Lister*, No. 09-17326PM, 2010 WL 4941475, at *2 (Bankr.D.Md. Nov. 24, 2010) ("[T]his court joins with the legion of other courts that have found no private right of action under HAMP.").  Nor can Plaintiffs recast their claim as a breach of contract claim based on a third-party beneficiary theory.  Such a claim is nowhere to be found in their complaint. And in any event, the overwhelming majority of courts have held that borrowers are not third-party beneficiaries to the

---

[19]  Plaintiffs also allege Chase "retaliated" against them, but the court cannot discern the basis for this claim.

servicing contracts between lenders and the government.[20]  *See,*
*e.g.*, *Acuna v. Chase Home Fin., LLC*, No. 3:10-CV-905, 2011 WL
1883089, at *4 (E.D.Va. May 17, 2011) (listing cases);
*Bourdelais v. J.P. Morgan Chase*, No. 3:10CV670-HEH, 2011 WL
1306311, at *3 (E.D.Va. Apr. 1, 2011) (same).  These cases fall
in line with a recent decision of the Supreme Court, *Astra USA,*
*Inc. v. Santa Clara County*, 131 S.Ct. 1342, 1348 (2011).  In
*Astra*, the Court emphasized that breach of contract actions
should not be used to create constructive private rights of
action where none otherwise exist.  *Id.* at 1348.  That is
exactly what Plaintiffs seek to do here.

    Second, Plaintiffs' claim for unjust enrichment fails.
Plaintiffs maintain that Chase was unjustly enriched because it
did not lower Plaintiffs' payments to the lowest level for which
Plaintiffs were eligible under the HAMP guidelines.  But as
Chase observes, a claim of unjust enrichment ordinarily cannot
be brought where the subject matter of the claim is governed by
an express contract between the parties.  *Janusz v. Gilliam*, 404

---

[20]    Plaintiffs cite one case to the contrary, *Marques v.*
*Well Fargo Home Mortg., Inc.*, No. 09-cv-1985-L(RBB), 2010 WL
3212131, at *3-6 (S.D.Cal. Aug. 12, 2010).  Most every case that
has cited *Marques* since has disagreed with it.  *Accord Nafso v.*
*Wells Fargo Bank, NA*, No. 11-10478, 2011 WL 1575372, at *4
(E.D.Mich. Apr. 26, 2011) ("The holding in *Marques* has been
rejected by several courts.").

Md. 524, 567 (2008). The written mortgage instruments define Plaintiffs' monthly payments. Accordingly, an unjust enrichment claim will not lie here.

Plaintiffs have stated, however, a claim under the ECOA. The ECOA, along with its accompanying Regulation B, contains certain procedures a creditor must use in processing an application for credit. Two of those requirements are important here. First, ECOA requires creditors to respond to applications within 30 days:

> Within thirty days (or such longer reasonable time as specified in regulations of the Board for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

15 U.S.C. § 1691(d)(1). In addition, when a creditor takes "adverse action" against an applicant,[21] the creditor must provide "a statement of reasons for such action" via one of two methods:

> (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

---

[21] With some exceptions, an adverse action "means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6).

> (B) giving written notification of adverse
> action which discloses (i) the applicant's
> right to a statement of reasons within
> thirty days after receipt by the creditor of
> a request made within sixty days after such
> notification, and (ii) the identity of the
> person or office from which such statement
> may be obtained. Such statement may be
> given orally if the written notification
> advises the applicant of his right to have
> the statement of reasons confirmed in
> writing on written request.

15 U.S.C. § 1691(d)(2). A liberal reading of the complaint suggests that Plaintiffs rely on both provisions; they argue that Chase (1) failed to provide timely notice in response to three loan modification applications and (2) provided an insufficient explanation after denying their March 2009 loan modification application.

Chase responds that Plaintiffs have not indicated "when the applications were complete and when Chase replied." (ECF No. 12-1, at 23). But at least as to two of the three loan modification applications, the complaint does offer the necessary specifics. It states, for example, that Plaintiffs applied for a modification on March 16, 2009 but Chase "deliberately responded six month [sic] later, on September 15, 2009." (ECF No. 1 ¶ 109). They also allege that they applied for a loan modification on January 20, 2010 but did not receive an answer "after more than 4 months." (*Id.* ¶ 140). The complaint does not state when Chase responded to the third

application, which was allegedly filed on December 12, 2009. (*Id.* ¶ 136).

Chase further protests that the complaint does not sufficiently allege when Plaintiffs submitted a "completed application." According to Regulation B, an application is complete only when "a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested (including . . . any additional information requested from the applicant)." 12 C.F.R. § 202.2(f). In short, Chase's view is that a creditor has no duty to respond until they hold a completed application. (ECF No. 12-1, at 23).

Chase position would seem to be incorrect. Creditors have an obligation to provide a timely response even to incomplete applications. Regulation B explains, "Within 30 days after receiving an application that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant either: (i) Of action taken . . . ; or (ii) Of the incompleteness." *See* 12 C.F.R. § 202.9(c). Thus, even if Chase were correct that the complaint "supports the inference that Plaintiffs failed to provide [a] 'completed application'" (ECF No. 51, at 17), Chase still might have had an obligation to communicate with Plaintiffs within 30 days (as Plaintiffs allege).

Chase also seems to have mischaracterized the complaint. The complaint states that, as to the March 2009 application, Plaintiffs "applied while current" for a loan modification. (ECF No. 1 ¶ 109). In December 2009, Plaintiffs "provided all requires [sic] documents and all proofs of income." (*Id.* ¶ 136). Plaintiffs also say they applied in January 20, 2010. Such allegations are sufficient at the motion to dismiss stage. *See, e.g.*, *Boyd v. U.S. Bank N.A. ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1*, --- F.Supp.2d ----, No. 10 C 3367, 2011 WL 1374986, at *8 (N.D.Ill Apr. 12, 2011) (listing cases establishing that a plaintiff's allegation that he applied for credit is enough to satisfy the completed application requirement at the motion to dismiss stage).

Chase also entirely overlooked Plaintiffs' other argument pursuant to Section 1691(d)(2). In particular, the complaint alleges that the notice Plaintiffs received in response to their first loan modification application – a one-sentence letter – did not provide adequate explanation. Regulation B suggests that any notice of adverse action should contain much more, including a statement of the action taken, the name and address of the creditor, a statement explaining ECOA's anti-discrimination provisions, the name and address of the federal agency administering ECOA compliance over the lender, and a statement of specific reasons for the action (or a disclosure

that the borrower can request such a statement).  Accordingly, as to the March 2009 loan modification, Plaintiffs have stated a claim under Section 1691(d)(2).

Therefore, the court will allow Plaintiffs to proceed with their claims under Section 1691(d)(1) related to their March 2009 and January 2010 loan modification applications.  Because the complaint does not specify when Chase responded to Plaintiffs' December 2009 application, the court will dismiss the Section 1691(d)(1) claim concerning that application. Plaintiffs may also proceed with their Section 1691(d)(2) claim related to the notice of adverse action they received in response to their March 2009 loan modification application.

g.    **Flooring and the Home's Ineligibility for a Loan**

Plaintiffs contend that Chase again engaged in false advertising in the real estate listing by failing to disclose that "the house was not eligible for any residential loan because it doesn't have any floor and it was [un]inhabitable." (ECF No. 1 ¶ 177).  They again seek relief under the Lanham Act.[22]

---

[22]    If Plaintiffs mean to argue that Chase wrongfully failed to disclose the lack of a floor, that claim fails as well.    The lack of a floor would be plainly evident and Plaintiffs purchased the home "as is."

Plaintiffs' claim concerning the flooring and financing issue fails for several reasons. The court has already explained, for instance, that Plaintiffs do not have standing under the Lanham Act to bring this type of claim. Additionally, a Lanham Act plaintiff cannot rely solely on the failure to disclose some fact; he must point to some affirmative representation that is rendered misleading, partially incorrect, or untrue because of the omitted fact. *See, e.g.*, *Healthpoint, Ltd. v. Stratus Pharms., Inc.*, 273 F.Supp.2d 871, 887 (W.D.Tex. 2001); *Brown v. Armstrong*, 957 F.Supp. 1293, 1303 & n.8 (D.Mass. 1997); *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 984 F.Supp. 768, 798 (S.D.N.Y. 1997); *cf. Mylan Labs., Inc v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993) (dismissing false advertising claim based on drug maker's failure to disclose lack of FDA approval, where the plaintiff did not point to any statement or representation in the defendant's advertising suggesting such approval); *see also* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:65 (4th ed. 2011 supp.) (listing cases). Plaintiffs have not pointed to any such affirmative misrepresentation in this case. But perhaps most obviously, Plaintiffs have not offered any facts indicating that they have been or are likely to be injured because of any misrepresentation concerning the financing issue. There are no

facts indicating injury and, by their own admission, Plaintiffs were ultimately able to secure financing.

Plaintiffs' claims concerning the flooring will be dismissed.

### h. Intentional Infliction of Emotional Distress

Plaintiffs contend that Chase intentionally inflicted emotional distress upon them by acting "like a criminal organization with a personal vendetta." (ECF No. 1 ¶ 48). To recover for intentional infliction of emotional distress, Plaintiffs would need to show that Chase's conduct was (1) intentional or reckless, (2) extreme and outrageous, (3) causally connected to Plaintiffs' emotional distress, and (4) the distress caused was severe. *Baltimore-Clark v. Kinko's Inc.*, 270 F.Supp.2d 695, 701 (2003) (citing *Harris v. Jones*, 281 Md. 560, 566 (1977)). "Each of these elements must be pled and proved with specificity. It is not enough for a plaintiff merely to allege that they exist; he must set forth facts that, if true, would suffice to demonstrate that they exist." *Foor v. Juvenile Servs. Admin.*, 78 Md.App. 151, 175 (1989); *see also Arbabi v. Fred Myers, Inc.*, 205 F.Supp.2d 462, 466 (D.Md. 2002). The tort is rarely viable in Maryland. *See Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F.Supp.2d 751, 757 (D.Md. 2011).

Chase protests that Plaintiffs have not pled facts sufficient to establish any of the four necessary elements.

Chase would seem to be correct, but there is no need to parse each element individually.  Most obviously, Plaintiffs have failed to allege sufficient injury.  Slight emotional discomfort or frustration is not enough; a plaintiff must suffer a "severely disabling emotional response, so acute that no reasonable man could be expected to endure it." *Cuffee v. Verizon Commc'ns*, 755 F.Supp.2d 672, 680 (D.Md. 2010) (quotation marks omitted).  Plaintiffs mostly offer general allegations that they were hurt and suffered.  They lost sleep.  They suffered distress and fear.  They faced a "nightmare" audit from the IRS.  These purported injuries hardly amount to wounds that are "incapable of healing themselves." *Valderrama v. Honeywell Tech. Solutions, Inc.*, 473 F.Supp.2d 658, 666 (D.Md. 2007); *see e.g.*, *Moniodis v. Cook*, 64 Md.App. 1, 15-16 (1985) (finding insufficient injury where a plaintiff "suffered symptoms such as increased smoking, lost sleep, and 'hives'").  The claim against Chase for intentional infliction of emotional distress must be dismissed.

### i.  Fraud

The complaint invokes the word "fraud" several times, but a plaintiff bringing a claim of fraud must do more than simply repeat the word over and over again.  Federal Rule of Civil Procedure 9(b) imposes a special particularity requirement on such claims.  Specifically, a plaintiff alleging fraud must

"plead with particularity the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *In re Mutual Funds Investment Litig.*, 566 F.3d 111, 120 (4th Cir. 2009) (quotation marks and ellipses omitted), *rev'd on other grounds by Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011).[23]

Plaintiffs intersperse fleeting references to fraud in several of the claims already discussed and rejected. Such claims do not succeed when repackaged in the language of fraud. Arguments related to the "conversion" of Plaintiffs' home, for instance, fail to state a claim because there was no conversion. In other words, Chase's statements regarding this conversion were not "false." *Boyd v. Hickman*, 114 Md.App. 108, 136 (1997) (explaining statements that are true when spoken cannot support fraud claim). The same is true of Plaintiffs' arguments regarding PMI cancellation, earnest money, and possible loan modification.

---

[23] Plaintiffs incorrectly suggest that Rule 9(b)'s particularity requirements do not apply to them. Even where a plaintiff is proceeding *pro se*, the particularity requirements of Rule 9(b) apply. *See, e.g.*, *Elemary v. Phillip Holzmann A.G.*, 533 F.Supp.2d 116, 137 (D.D.C. 2008); *Floyd v. Brown & Williamson Tobacco Corp.*, 159 F.Supp.2d 823, 832 (E.D.Pa. 2001).

As for the remaining allegations, they do not state a claim for fraud. Many of them are wildly general accusations that do not provide the requisite "who, what, where, when, why and how" of each particular fraud. *See Mitec Partners, LLC v. U.S. Bank Nat'l Ass'n*, 605 F.3d 617, 622 (8th Cir. 2010). Others seem to amount to mere disagreement over facts and law. *See, e.g., Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152 (6th Cir. 1987) (explaining that the "[t]he fact that the parties take different positions" does not evidence fraud). Still others lack any allegation concerning reliance, as the complaint indicates that Plaintiffs protested many of Chase's actions at every opportunity. *Sass v. Andrew*, 152 Md. App. 406, 441 (2003) (explaining that fraud claims requires proof that "the plaintiff relied on the misrepresentation and had the right to rely on it"). One could go on, but there is no purpose served in overstating the point: nothing in the complaint amounts to a properly pled fraud claim.

**j. Negligence**

Plaintiffs bring a negligence claim, wherein they allege that Chase acted negligently in breaching the sales contract and making "false statements on the law and facts." (ECF No. 1 ¶ 83). Other than reciting the elements of a negligence action, the complaint contains little additional discussion of the

negligence claim. Plaintiffs do not discuss their negligence claim in their opposition.

The complaint's allegations are not enough to support a negligence claim against Chase. "A complaint alleging negligence must contain the following elements: (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Blondell v. Littlepage*, 413 Md. 96, 119 (2010) (quotation marks and emphasis omitted). Plaintiffs have not alleged any particular duty Chase owed other than a contractual one, which will not support an action in negligence. *See Parks v. CAI Wireless Sys., Inc.*, 85 F.Supp.2d 549, 556 (D.Md. 2000); *Howard Oaks, Inc. v. Maryland Nat'l Bank*, 810 F.Supp. 674, 677-78 (D.Md. 1993); *Architectural Sys., Inc. v. Gilbane Bldg. Co.*, 779 F.Supp. 820, 821 (D.Md. 1991). Plaintiffs also have not provided facts rendering it plausible that Chase actually *breached* any legally cognizable duty.

The negligence claim against Chase will be dismissed.

**k. Civil Conspiracy**

Plaintiffs present a rather muddled civil conspiracy claim. In brief, they allege that "[a]ll fraudulent actions made by Chase to converte [sic] illegally our property and ownership of

our house involved many people of Chase Executives Group, many other companies . . . and two Maryland lawyers." (ECF No. 1 ¶ 44). Chase responds that the complaint does not contain any unlawful act that was done as part of the conspiracy or any indication of damage resulting from the conspiracy.

"Civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an unlawful act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff." *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 351-52 (2009). The plaintiff must also establish that the commission of some overt act in furtherance of the conspiracy caused him injury. *Id.* at 352.

As best the court can discern, Plaintiffs allege that Chase and other unidentified parties – likely the other Defendants – conspired to defraud Plaintiffs. This fraud has something to do with "Plaintiffs' personal property" and the "conversion" of their house. Beyond those meager facts, Plaintiffs offer nothing else concerning the "conspiracy."

Scant facts such as these will not suffice, especially where the object of the conspiracy is fraud. In such instances, Rule 9(b)'s particularity requirements apply, requiring plaintiffs to provides details of the time, place, and alleged

effects of the conspiracy. *In re Rood*, 426 B.R. 538, 552 (D.Md. 2010); *accord Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D.Md. 2000). Plaintiffs neglect each of those three elements here. Instead, Plaintiffs try to use rhetoric to transform Chase's every act into one more step in a vast plot to deceive. If "labels and conclusions" will not satisfy Rule 8's basic pleading standards, *Twombly*, 550 U.S. at 555, then rhetoric certainly will not satisfy the Rule 9's specificity standard.

Even setting aside Rule 9(b)'s pleading requirement, the facts alleged do not establish that Chase engaged in any tortious acts. Civil conspiracy is not a separate tort; it will not independently support an award of damages without some other tortious act and injury against a plaintiff. *Brass Metal Prods., Inc. v. E-J Enters., Inc.*, 189 Md.App. 310, 386 (2009). "Thus, no action in tort lies for conspiracy to do something unless the acts actually done, if done by one person, would constitute a tort." *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 143 (2006). Lacking any underlying tort claim against Chase, there is no conspiracy claim against it.

The civil conspiracy claim will be dismissed.

## 2. Simcox & Barclay

Plaintiffs' complaint contains several references to Chad King, a Maryland attorney with the firm of Simcox & Barclay who allegedly worked for Chase. The complaint alleges that King

sent Plaintiffs the document that allegedly "converted" Plaintiffs' home, wrote a letter informing Plaintiff that they still needed to continue making mortgage payments, refused to provide adequate explanations of Chase's actions concerning the "conversion" and the tax issues, and sent Plaintiffs a letter admitting that Chase had incorrectly reported Plaintiffs as late on their mortgage.

Plaintiffs' claims against the law firm fail because they all arise out of the firm's representation of Chase. As this court has recognized, a non-client third party generally cannot attack an attorney for the actions he takes on behalf of his clients. *Pradhan v. Al-Sabah*, 299 F.Supp.2d 493, 496 (D.Md. 2004). Permitting such liability would undermine an attorney's principal responsibility to represent his clients zealously. *Id.* Thus, Maryland courts have narrowly confined an attorney's liability to two situations: (1) cases implicating the duty an attorney owes to his client; and (2) cases implicating the duty an attorney owes to any third-party beneficiaries of the attorney-client relationship. *Schatz v. Rosenberg*, 943 F.2d 485, 492-93 (4th Cir. 1991).

Plaintiffs note that an attorney may still be held liable where the attorney engages in acts of fraud or collusion. *See Layman v. Layman*, 84 Md.App. 183, 187 (1990). While that may be true, Plaintiffs have not plausibly alleged any acts of fraud

implicating Simcox & Barclay. Moreover, a plaintiff wishing to invoke this "fraud exception" to the general rule against third-party liability must establish that the attorney "possess[ed] a desire to harm which is independent of the desire to protect his client." *Fraidin v. Weitzman*, 93 Md.App. 168, 237 (1992). Plaintiffs have not alleged any facts indicating that Simcox & Barclay possessed any such intent.

### 3. Fannie Mae, NRT Mid-Atlantic, First American, Long & Foster, and IAS

The motions to dismiss of the remaining defendants – Fannie Mae, NRT Mid-Atlantic, First American, and Long & Foster – require little comment. The claims against them largely fail for the reasons explained above. The claims against these defendants are deficient for the additional reason that Plaintiffs fail to make specific allegations against most of them. Instead, Plaintiffs seem to have adopted a "guilt-by-association" approach to pleading, which assumes that these defendants are liable merely because they participated in the sale and financing of Plaintiffs' house. (*See, e.g.*, ECF No. 39, at 3 ("[A]ll companies involved in the closing and in the HUD 1 statement . . . must accept their responsibility in this fraud since they received payment during the fraudulent transaction and they refused to listen to Plaintiffs' complaints.")). But especially when fraud is alleged, a party

may not rest liability on the "mere interrelationship between these entities and individuals in conducting lawful activities." *Adams*, 193 F.R.D. at 253.

Therefore, all of the remaining motions to dismiss will be granted.

**4. Guardian**

Plaintiffs failed to serve the only defendant that did not file a motion to dismiss, Guardian. In response to a show cause order, Plaintiffs explained that they tried but failed to serve Guardian's registered agent by certified mail. They further explained, however, that Guardian forfeited its corporate charter for non-payment of taxes on October 3, 2008. (ECF No. 50-2, at 3).

Because Guardian is a forfeited corporation, "it is no longer in existence and can no longer be sued." *Slattery v. Friedman*, 99 Md.App. 106, 117 (1994); *see also Scott v. Seek Lane Venture, Inc.*, 91 Md.App. 668, 686 (1992); *FDIC v. Hendrick*, 812 F.Supp. 586, 592-93 (D.Md. 1991). When a corporation forfeits its charter in Maryland, "the powers conferred by law on the corporation[] are inoperative, null, and void as of the date of the proclamation of forfeiture." Md. Code Ann., Corps & Ass'ns § 3-503(d). These powers include the right to sue and be sued. *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 163 (2004); *see also* Md. Code Ann., Corps & Ass'ns

§ 2-103(2) (listing the right to sue and be sued as a power of a corporation).

There is only one apparent exception to this general rule, but it would not apply here. A director-trustee of the corporation may be sued in his own name or in the name of the corporation if the suit concerns the "winding up" of the corporation's affairs. *Dual*, 383 Md. at 163; *accord Mintec Corp. v. Miton*, 392 B.R. 180, 185-89 (D.Md. 2008). There is, however, no suggestion from the complaint or anything else present in the record that this case relates to the "winding up" of Guardian. To the contrary, all of the events implicating Guardian happened well *before* its forfeiture. And even if they could somehow proceed against a director-trustee of Guardian, Plaintiffs have not established that they made a valid attempt at service. A plaintiff proceeding against a defunct corporation must "undertake a reasonable search for the identity of the directors-trustees, and . . . give them notice by mail or other means as certain to ensure actual notice." *Scott*, 91 Md.App. at 687. Plaintiffs did not undertake any such search.

Guardian will be dismissed.

### III. Motion for Sanctions

Plaintiffs filed a 49-page motion for sanctions against Defendants Chase, Fannie Mae, and Simcox & Barclay (collectively, the "Sanctions Defendants"), which is largely the

57

same text as Plaintiffs' opposition to those Defendants' motions to dismiss. (ECF No. 47). Along with several exhibits, they attached an additional 22-page "Motion Explaining Why Their Memorandum For Sanctions Against Chase Defendants Is Not Unjustified and Should Be Filed in Court 21 Days After Serving Defendants JP Morgan Chase, Fannie Mae and Simcox and Barclay on March 28, 2011." (ECF No. 47-3). The motion itself directs several questions at the Sanctions Defendants and accuses them of thirteen alleged "lies." The memorandum argues that the Sanctions Defendants "refused" to respond to the motion for sanctions and asks the court to order them to respond to Plaintiffs' questions "for the truth and justice." (ECF No. 47-3, at 6). It also asks that three attorneys be referred to the Maryland Attorney Grievance Commission.[24]

Federal Rule of Civil Procedure 11 permits a district court to impose sanctions. Among other things, the rule contemplates sanctions if an attorney submits something to the court for an improper purpose, *In re Kunstler*, 914 F.2d 505, 518 (4th Cir. 1990); advances a wholly frivolous clam, defense, or legal contention, *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 153

---

[24] In addition, Plaintiffs requested sanctions in some portions of their oppositions. (*See, e.g.*, ECF No. 49, at 11 (requesting sanctions against NRT Mid-Atlantic)). Such requests were not properly brought and will be denied.

(4th Cir. 2002); or makes a factual contention entirely unsupported by any information obtained before filing, *Brubaker v. City of Richmond*, 943 F.2d 1363, 1373 (4th Cir. 1991). *See also* Fed.R.Civ.P. 11(b). In determining whether an attorney violates Rule 11, the court applies an objective standard of reasonableness. *In re Weiss*, 111 F.3d 1159, 1170 (4th Cir. 1997).

Having reviewed Plaintiffs' motion, the court finds that it does not support the imposition of sanctions. It will be denied. The various "lies" and "frauds on the court" that Plaintiffs cite amount to mere disagreements over legal and factual positions taken by the Sanctions Defendants. Those positions are far from being so unreasonable as to amount to sanctionable conduct. Indeed, as has already been explained, most of the Sanctions Defendants' positions have merit.[25]

A motion for sanctions should not be used to seek information from an opposing party. The civil discovery process provides, when appropriate, the mechanism for obtaining information from opposing parties. Plaintiffs should not pose questions to Defendants in their filings with the court.

---

[25] Plaintiffs make much of the fact that the Sanctions Defendants did not "oppose" their motion. Local Rule 105.8.b provides that "a party need not respond to any motion filed under Fed. R. Civ. P. 11."

As for Plaintiffs' repeated insistence that the Sanctions Defendants "lied" in their motions papers, those inflammatory accusations of deceit are better left unsaid.[26] "That two parties disagree does not mean that one of them has bad motives. And even in the worst cases, the better practice is usually to lay out the facts and let the court reach its own conclusions." *Big Dipper Entm't, LLC v. City of Warren*, 641 F.3d 715, 719 (6th Cir. 2011); *see also, e.g.*, *Wiese v. Cmty. Bank of Cent. Wisconsin*, 552 F.3d 584, 591 (7th Cir. 2009) (admonishing a party for unduly accusatory tone in briefs). The court recognizes that Plaintiffs are not attorneys and that these matters are deeply personal for them. Nevertheless, they are expected to conduct themselves with decorum. If they do not, they may face future sanctions. "This court simply will not allow liberal pleading rules and pro se practice to be a vehicle for abusive documents." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005).

The court twice cautioned Plaintiffs against reflexively filing a motion for sanctions. Their request to file an extra-lengthy motion was also denied. Nevertheless, they ignored

---

[26]    Plaintiffs' filings also include gratuitous attacks on the parties. (*See, e.g.*, ECF No. 46, at 33 (characterizing Chase as "one of the worst lender [sic] in the country")).

these warnings and filed a total of 71 pages of briefing largely consisting of ungrounded accusations. Further misuse of filings by Plaintiffs will be met with sanctions.

## IV. Motion for Leave to Amend

Lastly, Plaintiffs have filed a motion for leave to add two additional defendants, Jobin Realty and Continental Home Loans. (ECF No. 53). The court construes this as an attempt to amend the complaint.

Federal Rule of Civil Procedure 15(a) governs an amendment that seeks to add a party before trial. *See Galustian v. Peter*, 591 F.3d 724, 730 (4th Cir. 2010). Plaintiffs wish to amend their complaint more than 21 days after it was filed and more than 21 days after service of a motion under Rule 12(b). Consequently, they need the opposing parties' written consent or the court's leave. *See* Fed.R.Civ.P. 15(a)(2).

Because they lack consent from the opposing parties, Plaintiffs seek leave of this court. The Local Rules impose certain requirements on plaintiffs who seek leave to amend. In particular, Local Rule 103.6 provides, in relevant part:

> **a. Original of Proposed Amendment to Accompany Motion**
> Whenever a party files a motion requesting leave to file an amended pleading, the original of the proposed amended pleading shall accompany the motion. If the motion is granted, an additional copy of the amended pleading need not be filed. The amended

pleading shall be deemed to have been served, for the purpose of determining the time for response under Fed. R. Civ. P. 15(a), on the date that the Court grants leave for its filing.

**b.    Exhibits to Amended Pleadings**
Unless otherwise ordered by the Court, only newly added exhibits are to be attached to an amended pleading. However, if the amended pleading adds a new party, counsel shall serve all exhibits referred to in the amended pleading upon the new party.

**c.    Identification of Amendments**
Unless otherwise ordered by the Court, the party filing an amended pleading shall file and serve (1) a clean copy of the amended pleading and (2) a copy of the amended pleading in which stricken material has been lined through or enclosed in brackets and new material has been underlined or set forth in bold-faced type.

Plaintiffs did not comply with the requirements of the Local Rules. They did not file a "clean copy" of their proposed amended complaint. Nor did they attach a copy of the amended complaint that indicates additions and revisions.

Compliance with the Local Rules is not optional. The rules pertaining to amendments, for instance, help ensure that the court has available all the information it needs to determine whether leave can be appropriately granted. And, of course, local rules "have the force of law." *Hollingsworth v. Perry*, 130 S.Ct. 705, 710 (2010) (quotation marks and citations omitted); Fed.R.Civ.P. 83(a)(1). As such, even pro se litigants

must follow them. "The Court can neither act as counsel for a *pro se* litigant nor excuse a *pro se* litigant's failure to comply with the Federal Rules of Civil Procedure, the Local Rules, or the orders of this Court due to ignorance of the law." *Cmty. Connections, Inc. v. Parker*, No. RWT 07CV3282, 2010 WL 148332, at *2 (D.Md. Jan. 12, 2010).

Therefore, if Plaintiffs wish to add these two potential defendants, they must resubmit a motion that complies with the Local Rules. The presently pending motion will be denied.

## V. Conclusion

For the foregoing reasons, the motion to dismiss filed by J.P. Morgan Chase Bank, N.A. will be granted in part and denied in part. All other motions to dismiss will be granted. Plaintiffs' motion for sanctions and motion for leave to amend will both be denied. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
